UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VANN L. BAILEY,              :    **1:19-CV-01458**
                                    :
             Plaintiff,        :    (Magistrate Judge Schwab)
                                      :
    v.                             :
                                      :
KEVIN KAUFFMAN, *et al.*,     :
                                      :
           Defendants.      :
                                      :

## <u>MEMORANDUM OPINION</u>

## I. Introduction.

After a Valentine's Day card found among the prison possessions of the plaintiff, Vann L. Bailey, tested positive for the presence of drugs, Bailey was sanctioned with disciplinary custody and his visitation was curtailed. Bailey now seeks a preliminary injunction enjoining prison officials to provide him an opportunity to have the Valentine's Day card retested and to reinstate his visitation rights with his mother. Because Bailey has not met the exacting standard for showing that he is entitled to such relief, we will deny his motion for a preliminary injunction.

## II.  Background and Procedural History.

Bailey began this action by filing a complaint along with another plaintiff. The parties later consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned.  We severed the claims of the other plaintiff from Bailey's claims.  Thus, this case now concerns only Bailey's claims.

On July 2, 2021, Bailey filed a second amended complaint naming the following officials and employees at the State Correctional Institution at Huntingdon ("SCI Huntingdon") as defendants: (1) Superintendent Kevin Kauffman; (2) Deputy Superintendent B. Brumbaugh; (3) Deputy Superintendent S. Walters; (4) Sergeant Yohn; (5) Corrections Officer Lofferty; and (6) Hearing Examiner S. Ellenberger.  Bailey's claims center around misconduct proceedings as to which he contends he was denied the opportunity to prove his actual innocence.   Bailey alleges the following facts.

On March 25, 2018, defendant Yohn, without permission from Bailey, searched Bailey's personal property. *Doc. 49* ¶¶ 11–12.  Yohn found a Valentine's Day card in Bailey's property. *Id.* ¶ 12.   According to Yohn, after he noticed an "Inked Red[] Line" inside the card, he called another officer, who was directed to conduct a Nark II test on the card. *Id.* ¶¶ 12–13.  The Nark II test purportedly resulted in a positive test for Suboxone. *Id.* ¶ 13.  And as a result, defendant

2

Lofferty issued a misconduct report charging Bailey with possession or use of a

dangerous or controlled substance and with possession of contraband. *Id.* ¶ 14.[1]

At a March 27, 2018[2] disciplinary hearing, Bailey informed defendant

Ellenberger, who was serving as the hearing examiner, that there was "information

and/or evidence available that he would like to retrieve to prepare and present in

his defense that would demonstrate [his] 'Actual Innocence,' such as the Nark II

testing results are inaccurate and utterly unreliable." *Id.* ¶ 15.  Bailey requested to

have the Valentine's Day card retested, and he informed defendant Ellenberger that

"based upon additional discovery and recovery, [he] would like to retrieve and

obtain signed statements, or, affidavits from other inmates that were exonerated

upon receiving a second Nark II test." *Id.* ¶ 16.[3]  Bailey alleges that he and

defendant Ellenberger agreed to postpone the disciplinary hearing to "allow him to

---

[1]  Bailey attached a copy of the misconduct report to his second amended complaint as Exhibit A. *See doc. 49-1* at 1–2.

[2]  Although Bailey alleges that this disciplinary hearing occurred on March 17, 2018, that appears to be a typographical error given that the misconduct report was not issued until March 25, 2018.  Based on Bailey's other allegations and the documents that he attached to his second amended complaint, it appears that this hearing took place on March 27, 2018, rather than March 17, 2018.

[3]  Although the second amended complaint is not entirely clear, construing the allegations liberally in the light most favorable to Bailey, we assume that Bailey is alleging that he told this to defendant Ellenberger at the time.

retrieve and obtain evidence to demonstrate and establish 'Actual Innocence.'" *Id.*
¶ 17.[4]

Two days later—March 29, 2018[5]—Bailey appeared before defendant
Ellenberger again for a disciplinary hearing. *Id.* ¶ 18.  According to Bailey,
although he had requested to have the Valentine's Day card retested and he
asserted that "other similarly situated" inmates had been permitted a second test,
defendant Ellenberger denied his request for additional testing and ignored or
rejected his evidence of other inmates being exonerated upon receiving a second
Nark II test. *Id.* ¶¶ 18–19.  Ellenberger stated that he believed the written report of
defendant Lofferty over Bailey's presentation, and based on a photo of the Nark II
test ("not the actual Nark II report/testing results indicating positive for the
presence of suboxone"), Defendant Ellenberger found Bailey guilty of the charged
misconduct. *Id.* ¶¶ 19–20.  Defendant Ellenberger sentenced Bailey to 45 days in
disciplinary confinement in the Restricted Housing Unit ("RHU"). *Id.* ¶ 21.  The

---

[4]  Bailey attached a copy of a Waiver of Disciplinary Procedures form to his
second amended complaint as Exhibit B. *See doc. 49-1* at 3–4.  On this form,
which is dated March 27, 2018, and signed by Bailey, there is an "x" next to the
box that provides: "I wish to have a disciplinary hearing, but I hereby voluntarily
waive my right to have the hearing within 7 working days of receiving notice of
the charge and request that it be scheduled within a reasonable time hereafter." *Id.*
at 4.

[5]  Bailey alleges this date as March 29, 2020, but that is obviously not correct given
that Bailey's other allegations and the documents that he attached to his second
amended complaint show that the events at issue occurred in 2018.

misconduct sanction also, Bailey alleges, resulted in him losing his visitation rights with his "Elderly Sick Mother." *Id.* ¶ 21.[6]

From May 15, 2018, through June 28, 2018, Bailey wrote to defendants Kauffman, Brumbaugh, and Walters requesting to be allowed to have the Valentine's Day card retested at his expense as "other similarly situated" inmates had been exonerated after receiving permission to have a second, or retest, of the Nark II samples. *Id.* ¶ 22.  More specifically, on May 15, 2018, Bailey alleges, he sent a request form to defendant Brumbaugh requesting that Brumbaugh look into or intervene as to the "unfair and unlawful finding of guilt by allowing him to pay" to have the card retested to demonstrate his actual innocence. *Id.* ¶ 23.  Bailey attached a copy of this request and Brumbaugh's response to this request to his second amended complaint as Exhibit D. *See doc. 49-1* at 7–8.  The body of the request reads:

> Now I had written Capt. Stevens he isn't answering my request slips.  I understand there is no procedure for outside testing.  I had receive[d] 45 days due to a [Valentine's] day card tested positive for suboxones.  My family is willing to pay the State Police to test the card to show my actual innocencies [sic][.]  My family [is] going [to] contact the state police.  I'm going to need the card sent to the state police[.]  Will it be a problem?  Mother sent me that card 3 years ago.

---

[6]  Bailey attached a copy of the Disciplinary Hearing Report to his second amended complaint as Exhibit C. *See doc. 49-1* at 5–6.  That report shows that Ellenberger sentenced Bailey to 45 days in disciplinary custody, but that report does not mention anything about loss of visitation. *Id*. at 6.

*Id*. at 8 (changed from all capital letters to aid readability).  Brumbaugh responded
to Bailey:  "We will need to be informed by our legal team before we turn anything
over to anyone." *Id*.

Then, on May 22, 2018, Bailey sent to defendant Kauffman a request, which
according to Bailey, requested that Kauffman also look into or intervene as to his
finding of guilt and allow him to pay to have the card retested to demonstrate his
actual innocence. *Doc. 49* ¶ 24.  Bailey attached a copy of this request and
Kauffman's response to his second amended complaint as Exhibit E. *See doc. 49-1*
at 9–10.  The body of the request reads:

> Now the security dept. need[s] to hold the [Valentine's] day
> card that was confiscated #C-092698.  The security dept. [is]
> suppose to hold all evidence up to two years.  I'm willing to
> pay a toxicology to test the [Valentine's] day card for drugs.

*Id*. at 10 (changed from all capital letters to aid readability).  Kauffman responded
to Bailey:  "I will ensure the Security Office is aware of your concerns." *Id*.

Bailey also appealed defendant Ellenberger's decision to the Program
Review Committee. *Doc. 49* ¶ 25.  According to Bailey, he asked the Program
Review Committee to look into or to intervene as to the unfair and unlawful
sanction imposed by defendant Ellenberger, and he again asked to have the card
retested. *Id.* ¶¶ 25–26.  Bailey attached a copy of what he refers to as his appeal to
the Program Review Committee to his second amended complaint as Exhibit F.
*See doc. 49-1* at 11–12.  The body of that document reads:

> I Vann Bailey plead not guilty to charges #22 & 36[.]  I would
> like to have this [Valentine's] Day card tested by the state
> police.
>
> The fact is that the Nark II test is not 100% accurate.  I'm
> asking HEX to provide an opportunity to have a fear [sic]
> shak[e] by requesting the institution to re-test the card due to
> the Nark II not being accurate[.]  If I'm not able to receive this
> opportunity[,] the HEX den[y]ing due process and equal
> protection of laws;  HEX be mispresenting the facts in his
> sanction by not giving me the opportunity to show I'm actual
> innocence [sic] of the charges.
>
> [additional sentence through which there are lines drawn]

*Id*. at 12 (changed from all capital letters to aid readability).

The Program Review Committee, which included defendants Walters and

Brumbaugh, sustained defendant Ellenberger's decision. *Doc. 49* ¶ 26.  Bailey

attached a copy of the Program Review Committee's decision to his second

amended complaint as Exhibit G. *See doc. 49-1* at 13–14.  The discussion section

of the Program Review Committee's decision provides:

> Mr. Bailey submitted an appeal to his misconduct
> questioning why there was not videotaping of the Nark II test.
> He also challenges that the photograph of the card doesn't show
> any information or that the card test[e]d positive for suboxone.
> He further questions why the Nark II test results are not sent out
> for a second test.
>
> The PRC reviewed the misconduct report and appeal.  In
> this review, the Committee cannot find any evidence that the
> procedures employed were contrary to law, Department
> directives, or regulations.  The misconduct report states that
> staff reported that the card tested positive for suboxone.  A
> photocopy of the card and positive test results are attached to
> the misconduct appeal.  The photo clearly shows a positive test

result for opiates.  Therefore, the Committee concurs with the
Hearing Examiner that the staff report and attached photocopy
provide enough evidence to determine guilt.

      The Committee also finds that the Security office
followed proper procedure by conducting the Nark II test.
DOC policy does not require a second test.

      In conclusion, the presented information provides enough
evidence to justify the imposed sanction.  The sanction is
proportionate to the offense.  The actions of the Hearing
Examiner are sustained.

*Id*. at 14 (underlining omitted).

Bailey complains that he was not afforded the opportunity to have the

Valentine's Day card retested to establish the inaccuracy of the Nark II test or to

establish his actual innocence of the misconduct charges. *Doc. 49* ¶ 27.  He asserts

that "other similarly situated" inmates such as Robert King, Anthony C. King, and

James Frankco were exonerated after receiving permission to retest or have a

second test after a positive Nark II test. *Id.* ¶¶ 22, 23, 31, 33.  Bailey was not,

however, afforded the same opportunity as "other similarly situated" inmates

regarding retesting. *Id.* ¶ 28.  He asserts that this failure to allow him a retest was

without reason or a legitimate justification. *Id.* ¶¶ 31, 33.  And apart from him,

SCI-Huntingdon continues to provide "other similarly situated" inmates with an

opportunity for a second test to confirm Nark II results. *Id.* ¶ 35.[7]

---

[7]  In support of this assertion, Bailey points to three declarations from other
inmates (Rakeem Spencer, Keith Lee, and Tysign Jackson) that he attached to his
second amended complaint as Exhibit I. *See doc. 49-1* at 17–20.  The factual

According to Bailey, defendants Brumbaugh, Kauffman, Walters, and Ellenberger were aware of the procedures and protocols regarding the testing of inmates, including the use of the Nark II test. *Id.* ¶ 29.  And, he contends, all the defendants were aware that the Nark II test was not reliable and that before his situation arose, "other similarly situated" inmates had been exonerated after receiving a second test. *Id.* ¶¶ 28–29, 32, 33.

Bailey contends that the Nark II tests is a Fluorescence Polarization Immunoassay test that is only 85 % accurate, which, Bailey stresses, means that in 15% of cases, it will be inaccurate. *Id.* ¶ 29.  According to Bailey, given the inaccuracy of the Nark II test, results from a Nark II test should not be used unless a second test is provided to confirm the results. *Id.*  And he alleges that all the defendants were aware that the Nark II test was not 100% accurate, they knew or should have known that samples for the Nark II test must be handled with care by trained individuals, and they knew or should have known that "<u>all test results must be confirmed by an Approved Analytical Laboratory</u>[.]" *Id.* ¶¶ 30, 32 (underlining in original) (quoting *doc. 49-1* at 16, which appears to be a page from the internet

---

assertions in each of these declarations are the same. *Id.*  Inmates Spencer, Lee, and Jackson assert that they are incarcerated at SCI Huntingdon; that during May 2021, they were ordered to provide a urine sample; that they were informed that their urine samples tested positive for marijuana and/or suboxin; that SCI Huntingdon provided a second test; and that prison staff informed them that they would be transferred, along with other inmates, from the prison's outside dormitories, known as the MOD's, to general population until the urine-test results were returned. *Id.*

offering the Nark II test for sale and which Bailey has attached to his second amended complaint as Exhibit H).

Bailey presents four claims in his second amended complaint.[8]  His first claim is a due process claim. *Doc. 49* ¶ 40.  He alleges that all the defendants (but in particular, defendant Ellenberger) deprived him of the right to present his defense of actual innocence to the misconduct charges. *Id.* ¶¶ 1, 34.  He contends that he has suffered punitive confinement in disciplinary segregation and loss of his right to visitation by his elderly, sick mother. *Id.* ¶ 37.

Bailey's second claim is construed as an equal protection claim.  He contends that the defendants deprived him of the right not to be treated differently without a compelling justification or timely notice. *Id.* ¶ 41.  He refers to the class-of-one theory. *Id.*  He alleges that he was and is being treated differently from "other similarly situated" inmates. *Id.* ¶¶ 22, 23, 31, 33, 35, 36.  Although Bailey asserts that this is also a due process claim, construing the complaint liberally and given that Bailey is proceeding pro se and that he has used language that is used in connection with an equal protection claim, we will construe Bailey's second claim as an equal protection claim.

---

[8]  Although in the introductory paragraph of his second amended complaint, Bailey references 42 U.S.C. § 2000-1(c), *see doc. 49* ¶ 1, there is no such statutory provision, and we are unsure of to what Bailey intended to refer.

Bailey's third claim is an Eighth Amendment claim. *Id.* ¶ 42.  Suggesting that the defendants inflicted unnecessary and wanton infliction of pain on him by confining him in disciplinary segregation, Bailey alleges that the defendants' actions and omissions deprived him of the right to be free from cruel and unusual punishment. *Id.* ¶¶ 38, 42.

Bailey's fourth claim is a First Amendment free association claim. *Id.* ¶ 43. This claim is based on the restriction on his visitation rights with his elderly, sick mother. *Id.* ¶¶ 1, 38.

Contending that he is subject to irreparable harm, Bailey seeks injunctive relief. *Id.* ¶¶ 39, 45.  In this regard, he contends that although he is no longer confined in the RHU, he continues to suffer from the defendants' bias and unfair policies; he is "at risk of again being subjected to unnecessary and unwarranted institution's protocols and policies on account of his activism in litigating" this case; to date, he has not been afforded the same opportunity as "other similarly situated" inmates for retesting; and he still suffers from the loss of visitation with his elderly, sick mother. *Id.* ¶ 39.  He also seeks compensatory and punitive damages as well as attorney's fees and costs. *Id.* ¶¶ 46–48.

Currently pending is Bailey's motion for a preliminary injunction. *See doc. 36*.  That motion has been briefed. *See docs. 37*, *42*, *46*.  For the reasons discussed below, we will deny Bailey's motion.

11

## III.  Discussion.

Bailey seeks a preliminary injunction requiring the defendants to provide him an opportunity to have the Valentine's Day card retested.  But because the Valentine's Day card no longer exists, *see docs. 50*, *52,* the court cannot order that the card be retested.  Bailey also seeks a preliminary injunction requiring the defendants to reinstate his visitation rights with his mother.  Addressing Bailey's motion in this regard, we conclude that Bailey has not shown that he is entitled to a preliminary injunction.

Federal Rule of Civil Procedure 65 governs temporary restraining orders and preliminary injunctions.  A motion for a preliminary injunction is judged against exacting legal standards.  Preliminary injunctive relief "is not granted as a matter of right." *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982).  Rather, it "is an 'extraordinary remedy.'" *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018) (quoting *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)).  A motion for such is properly granted only if such relief is the "only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).  "It has been well stated that upon an application for a preliminary injunction to doubt is to deny." *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937).

"When evaluating a motion for preliminary injunctive relief, a court considers four factors: (1) has the moving party established a reasonable likelihood of success on the merits (which need not be more likely than not); (2) is the movant more likely than not to suffer irreparable harm in the absence of preliminary relief; (3) does the balance of equities tip in its favor; and (4) is an injunction in the public interest?" *Fulton v. City of Philadelphia*, 922 F.3d 140, 152 (3d Cir. 2019). "The first two factors are prerequisites for a movant to prevail." *Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

In their brief in opposition, the defendants do not specifically address Bailey's request for reinstatement of visitation with his mother.[9]  Nevertheless, the defendants contend, among other things, that Bailey is not entitled to a preliminary

---

[9]  We note that Bailey's motion for a preliminary injunction was filed and briefed before Bailey filed his second amended complaint, which more clearly than his amended complaint sets forth that he is complaining about the loss of his visitation with his mother.  Nevertheless, his amended complaint also addressed the loss of visitation. *See doc. 25* ¶¶ 29–31, 37, 38.  And in connection with his motion for a preliminary injunction, Bailey addressed reinstatement of his visitation rights with his mother. *See doc. 36* ¶ 4 (motion—mentioning visitation rights), *doc. 37* at 3, 4, 7, 8 (brief in support—mentioning visitation rights); *doc. 37* at 11 (proposed order—ordering reinstatement of visitation rights with mother); *doc. 46* at 2, 3 (reply brief—mentioning visitation rights).

injunction because he has not shown that he has a reasonable likelihood of success on the merits.  We agree.

### A.  First Amendment–Freedom of Association.

Since Bailey requests reinstatement of his visitation rights with his mother, we begin by addressing Bailey's First Amendment claim, which is based on the loss of visitation with his mother.

The First Amendment provides, in pertinent part, that "Congress shall make no law . . . abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.  The Supreme Court "has 'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others.'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622, (1984)).  That right of association "protects 'certain kinds of highly personal relationships,'" such as "a right to maintain certain familial relationships, including association among members of an immediate family . . . ." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (quoting *Roberts*, 468 U.S. at 618).

But "[p]risons . . . differ in numerous respects from free society." *Jones v. N. Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 129 (1977).  And "[i]n [the]

prison context, an inmate does not retain those First Amendment rights that are 'inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" *Id*. (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  Noting that it was not holding or implying "that any right to intimate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners," the Supreme Court has observed that "freedom of association is among the rights least compatible with incarceration." *Overton*, 539 U.S. at 131.

In *Overton*, the Supreme Court considered a challenge by a class of Michigan prisoners and their friends and family to prison regulations that restricted the prisoners' visitation in various ways including, as relevant here, by prohibiting prisoners who committed multiple substance-abuse violations from having any visitors except attorneys and members of the clergy. *Id*. at 130.  More specifically, that Michigan restriction applied to "inmates with two substance-abuse violations[.]" *Id*. at 134.  "An inmate subject to th[at] restriction [could] apply for reinstatement of visitation privileges after two years." *Id*. at 130.  "Reinstatement [was] within the warden's discretion." *Id*.  Applying the *Turner* factors,[10] the

---

[10]  *See Turner v. Safley*, 482 U.S. 78 (1987).  In *Turner*, the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id*. at 89.  The Court identified factors to consider when determining the reasonableness of a regulation that impinges on a constitutional right: (1) whether there is "a 'valid,

Supreme Court held that the regulations did not violate the prisoners' First Amendment right of association.

Observing that "[d]rug smuggling and drug use in prison are intractable problems[,]" and reasoning that "[w]ithdrawing visitation privileges is a proper and even necessary management technique to induce compliance with the rules of inmate behavior, especially for high-security prisoners who have few other privileges to lose[,]" the Court concluded that the restriction "serves the legitimate goal of deterring the use of drugs and alcohol with the prisons." *Id*. at 134.  In so concluding, the Court noted the prisoners' argument that reinstatement is not guaranteed after two years, the Court agreed that the restriction was severe, and the Court observed that "if faced with evidence that [the] regulation is treated as a *de facto* permanent ban on all visitation for certain inmates, we might reach a different conclusion in a challenge to a particular application of the regulation." *Id.*

The Court also concluded that the prisoners have alternative means of exercising their right of association—they "may communicate with persons outside the prison by letter and telephone." *Id*. at 135.  And considering "the impact that

rational connection' between the prison regulation and the legitimate governmental interest put forth to justify it"; (2) "whether there are alternative means of exercising the right that remain open to" the prisoner; (3) the impact that an "accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there is "an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *Id.* at 89–91.

accommodation of the asserted associational right would have on guards, other inmates, the allocation of prison resources, and the safety of visitors[,]" the Court observed: "Accommodating respondents' demands would cause a significant reallocation of the prison system's financial resources and would impair the ability of corrections officers to protect all who are inside a prison's walls.  When such consequences are present, we are 'particularly deferential' to prison administrators' regulatory judgments." *Id.* at 135 (quoting *Turner*, 482 U.S. at 90).  And as to ready alternatives, the Court concluded that the prisoners' suggested alternatives— that "the duration of the restriction for inmates with substance-abuse violations could be shortened or that it could be applied only for the most serious violations"—"do not go so far toward accommodating the asserted right with so little cost to penological goals that they meet *Turner*'s high standard." *Id.* at 136.

     In our case, Bailey has not developed his claim based on the loss of visitation with his mother.  As mentioned above, although Bailey alleges that the misconduct sanction relating to the Valentine's Day card resulted in him losing his visitation rights with his "Elderly Sick Mother," *doc. 49* ¶ 21, he has not presented any evidence to support that allegation.  The Disciplinary Hearing Report, which is attached to Bailey's second amended complaint as Exhibit C, *See doc. 49-1* at 5–6, shows that defendant Ellenberger sentenced Bailey to 45 days in disciplinary custody, but that report does not mention anything about loss of visitation. *Id.* at 6.

The Pennsylvania Department of Corrections' policy regarding inmate visiting privileges, DC-ADM 812, provides that "[v]isits may be suspended, terminated, or restricted, to maintain the security and orderly running of the visiting room and/or the facility or as made necessary by the behavior of the inmate or visitor(s)." DC-ADM 812 §1.N.1 available at

https://www.cor.pa.gov/About%20Us/Pages/DOC-Policies.aspx (last visited July 26, 2021).[11]  More specifically, the policy provides, in pertinent part:

> 4.  *In accordance with Department policy DC-ADM 801,* any inmate who is *dealing, using (including positive drug test results or refusal to submit to drug testing),* or possessing illegal or non-prescribed drugs and/or drug paraphernalia, will be prohibited from having contact visits for the period specified below.  This period and the special security precaution will commence *immediately upon the issuance of the misconduct and continue, pending the outcome of the misconduct hearing.*  Upon a finding of guilt, *contact visits shall be prohibited for the periods outlined below, and the inmate shall be referred to the Drug and Alcohol Treatment Department for an assessment of treatment needs.  If the inmate is found not guilty of the misconduct, then contact visits shall be reinstated immediately.*
>
> 1st offense – *180* days
>
> 2nd offense – *one year*

---

[11]  We note that the effective date of this version of DC-ADM 812 is September 27, 2018.  We obtained this version of DC-ADM 812 from the Department of Corrections' website.  And the defendants recently attached a copy of this version of DC-ADM 812 to their brief in support of their motion to dismiss. *See doc. 54-1*. Although the misconduct charge regarding the Valentine's Day card was issued on March 25, 2018, the parties have not provided the court with a copy of DC-ADM 812 in effect on that date.

3rd offense – *indefinite ban*

. . .

6.  After three years of an inmate's contact visiting privileges being suspended, and provided that the inmate has successfully participated in Alcohol and Other Drugs Treatment, the inmate may request reinstatement of his/her visiting privileges by submitting a written request to the Facility Manager.  Upon receipt of such a request, the Facility Manager shall review the request, make a recommendation of approval/disapproval, and forward it to the *Executive Deputy Secretary of Institutional Operations (EDSI)*/Regional Deputy Secretary.  The *EDSI*/Regional Deputy Secretary shall determine *if* the inmate's visiting privileges are to be instated and inform the Facility Manager of the determination.  The Facility Manager/*designee* shall inform the inmate of the decision.

7.  Any visitor, including immediate family members of the inmate, who attempts to bring or who brings drugs *onto* the grounds of any Department facility will be *indefinitely* banned from visiting at all Department facilities *(includes video visitation)* and the matter shall be referred to the Pennsylvania State Police for prosecution.

*Id*. §1.N.4–7 (bold and italics in original).

Given the apparent similarity of DC-ADM 812 to the probation at issue in

*Overton*, which the Supreme Court concluded did not violate the prisoners' First

Amendment right to association, we conclude that Bailey has not shown that he

has a reasonable likelihood of success on the merits of his First Amendment claim.

On the current record, Bailey has failed to show that under the *Turner* factors, the

prohibition on visits from his mother is not reasonably related to legitimate

penological interests.  The Supreme Court in *Overton* found that visiting

19

restrictions on a prisoner found guilty of drug violations in prison "serves the legitimate goal of deterring the use of drugs and alcohol with the prisons." 539 U.S. at 134.  So too here.  And like in *Overton*, DC-ADM 812 allows for a prisoner to seek reinstatement of this visiting rights after a certain period.[12]  Thus, although indefinite,[13] the ban is not necessarily permanent.  And there is no evidence that Bailey cannot communicate with his mother by letter or telephone.  Bailey also has not established what effect requiring the prison to allow him to visit with his mother would have on guards, other inmates, prison resources, and other visitors. Nor has Bailey set forth an alternative to the prohibition that would fully accommodate his right at a *de minimis* cost to valid penological interests.  Thus, on the current record, we cannot say that Bailey has a reasonable likelihood of success on the merits of his First Amendment claim.

### B.  Eighth Amendment.

Bailey has also not shown that he has a reasonable likelihood of success on the merits of his Eighth Amendment claim.

---

[12]  Under DC-ADM 812, that period is three years, whereas in *Overton*, the period was two years.  There is no basis to conclude that this one-year time difference should lead to a different result.

[13]  Since the misconduct at issue occurred in 2018, and Bailey contends that he still cannot visit with his mother, we assume that Bailey is subject to an indefinite ban on visitation.

"The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'" *Glossip v. Gross*, 576 U.S. 863, 876 (2015).  Conditions that inflict needless suffering, whether physical or mental, may constitute cruel and unusual punishment. *Tillery v. Owens*, 719 F. Supp. 1256, 1275 (W.D. Pa. 1989), *aff'd*, 907 F.2d 418 (3d Cir. 1990).  An Eighth Amendment claim gives rise to a two-prong analysis; such a claim has both an objective element and a subjective element. *Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018) ("A properly stated Eighth Amendment claim must allege a subjective and objective element.").  "To determine whether prison officials have violated the Eighth Amendment, we apply a two-prong test: (1) the deprivation must be 'objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities'; and (2) the prison official must have been 'deliberate[ly] indifferen[t] to inmate health or safety.'" *Porter v. Pennsylvania Dept of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

In *Overton*, the Supreme Court addressed whether the visiting restrictions at issue in that case violated the Eighth Amendment. 539 U.S. at 136–37.  The Court observed that the restriction on inmates with two substance abuse violations "undoubtedly makes the prisoner's confinement more difficult to bear[,] [b]ut it

21

does not, in the circumstances of this case, fall below the standards mandated by the Eighth Amendment." *Id*. at 136.  The Court noted that "Michigan, like many other States, uses withdrawal of visitation privileges for a limited period as a regular means of effecting prison discipline." *Id*. at 137.  And it concluded that "[t]his is not a dramatic departure from accepted standards for conditions of confinement." *Id*.  The Court also concluded that the restriction at issue there did not "create inhumane prison conditions, deprive inmates of basic necessities, or fail to protect their health or safety." *Id*.  "Nor d[id] it involve the infliction of pain or injury, or deliberate indifference to the risk that it might occur." *Id*.  Although the Court in *Overton* upheld the restrictions at issue in that case, it left open the possibility that a permanent ban on all visitation might violate the Eighth Amendment. *Id*. ("If the withdrawal of all visitation privileges were permanent or for a much longer period, or if it were applied in an arbitrary manner to a particular inmate, the case would present different considerations."); *see also Henry v. Dep't of Corr.*, 131 F. App'x 847, 850 (3d Cir. 2005) (observing that the Supreme Court in *Overton* strongly suggested that a permanent ban on all visitation might constitute cruel and unusual punishment).

Here, as set forth above, given that DC-ADM 812 allows for a prisoner to seek reinstatement of this visiting rights after three years, the ban is not necessarily permanent.  And like in *Overton*, there is no basis to conclude that the visiting

restriction creates inhumane prison conditions, deprives Bailey of basic necessities, places his health or safety in danger, or involves the infliction of pain or injury.

And to the extent that Bailey's Eighth Amendment claim is based on in his confinement in the RHU, he has not proffered evidence as to those conditions. Moreover, Bailey is no longer in the RHU.

In sum, Bailey has not shown that he has a reasonable likelihood of success on the merits of his Eighth Amendment claim.

### C. Due Process.

Bailey claims that the defendants denied him due process in connection with the disciplinary proceedings relating to the Valentine's Day card.

The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.  A due process claim requires a two-part analysis.  First, the court must determine whether the interest asserted by the plaintiff is within the scope of protection of life, liberty, or property found in the Due Process Clause. *Shoats v. Horn,* 213 F.3d 140, 143 (3d Cir. 2000).  Second, if the interest is one that is protected by the Due Process Clause, "the question then becomes what process is due to protect it." *Id.*

"[L]iberty interests 'may arise from two sources—the Due Process Clause itself and the laws of the States.'" *Fantone v. Latini*, 780 F.3d 184, 188 (3d Cir. 2015) (quoting *Hewitt v. Helms,* 459 U.S. 460, 466 (1983)).  The former is characterized "as an 'independent due process liberty interest' and the latter as a 'state-created liberty interest.'" *Powell v. Weiss*, 757 F.3d 338, 341 (3d Cir. 2014) (quoting *Renchenski v. Williams,* 622 F.3d 315, 325 (3d Cir. 2010)).  "The denial of prison access to a particular visitor 'is well within the terms of confinement ordinarily contemplated by a prison sentence,' and therefore is not independently protected by the Due Process Clause." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 461 (1989) (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)).  Thus, we turn to whether Bailey can show that he has a state-created liberty interest regarding visitation with his mother.

In *Sandin v. Conner,* 515 U.S. 472 (1995), addressing the question of when the state can create liberty interests protected by the Due Process Clause, the United States Supreme Court held:

> States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id.* at 483–84.

24

"After *Sandin,* it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson v. Austin,* 545 U.S. 209, 223 (2005) (quoting *Sandin,* 515 U.S. at 484).  In deciding whether a protected liberty interest exists under *Sandin,* we consider the duration of the confinement and the conditions of that confinement in relation to other prison conditions. *Mitchell v. Horn,* 318 F.3d 523, 532 (3d Cir. 2003).  Whether a protected liberty interest exists under *Sandin* requires inquiry into the specific facts of the case. *Id.* at 533.  But "inmates are generally not entitled to procedural due process in prison disciplinary hearings because the sanctions resulting from those hearings do not usually affect a protected liberty interest." *Burns v. Pennsylvania Dept. of Corrections,* 642 F.3d 163, 171 (3d Cir. 2011).

"Courts have held that a loss of visitation privileges is one of the 'ordinary incidents' of prison confinement." *Henry v. Dep't of Corr.*, 131 F. App'x 847, 849 (3d Cir. 2005) (citing cases).  And while "a lifetime ban on all visitation," "might well" amount to an "atypical and significant [hardship] . . . in relation to the ordinary incidents of prison life[,]" *id.* (quoting *Sandin*, 515 U.S. at 484), as already noted, it appears that although Bailey is facing an indefinite ban on

25

visitation, given that that he can seek reinstatement of this visiting rights after three years, the ban is not necessarily permanent.  And Bailey has not otherwise shown that the ban amounts to an "atypical and significant hardship [on him] in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.  Thus, Bailey has not shown that he has a state-created liberty interest. *See generally*, *Pfender v. Sec'y Pennsylvania Dep't of Corr.*, 443 F. App'x 749, 752 (3d Cir. 2011) (holding that "Pfender has made no showing that Pennsylvania law creates a protected liberty interest in visiting privileges").

Nor has Bailey shown that his confinement in the RHU amounted to an "atypical and significant hardship [on him] in relation to the ordinary incidents of prison life[,]" *Sandin*, 515 U.S. at 484, such that he had a state-created liberty interest protected by the Due Process Clause.  Bailey was sentenced to 45 days in the RHU.  But that amount of time in disciplinary custody by itself does not amount to an atypical and significant hardship. *See Smith v. Mensinger,* 293 F.3d 641, 654 (3d Cir.2002) (holding that seven months of disciplinary confinement not an atypical and significant hardship).  And Bailey does not allege anything regarding the conditions in the RHU.

In sum, Bailey has not proffered evidence from which it can reasonably be inferred that he was subjected to atypical and significant hardships in relation to the ordinary incidents of prison life as a result of the findings of guilt on the

misconduct charge relating to the Valentine's Day card such that he had a liberty

interest protected by the Due Process Clause.  Accordingly, he fails to show that he

has a reasonable likelihood of success on the merits of his due process claim.

### D.  Equal Protection.

Bailey contends that the defendants denied him equal protection of the law

because they did not allow him the opportunity to retest the Valentine's Day card

that purportedly tested positive for Suboxone even though the Pennsylvania

Department of Corrections regulations allow for such a test[14] and even though

other similarly situated inmates were provided an opportunity for a retest after a

positive drug test.

The Equal Protection Clause directs that all similarly situated individuals be

treated alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).

---

[14]  In support of this contention, Bailey submitted a May 14, 2008 Memorandum from former Pennsylvania Department of Corrections' Secretary Jeffrey A. Beard regarding updates to DC-ADM 801 and DC-ADM 802. *See doc. 46-1* at 1–2.  That memorandum provides, in pertinent part:

> Subsection D.9.a. shall now read:
> a.  For each separate positive finding that he/she challenges as a
> false positive the inmate must sign a DC-138A, Cash Slip for
> the cost of the GC/MS confirmation.

*Id*. at 2.  But DC-ADM 801 and DC-ADM 802 have since been updated (current versions available at https://www.cor.pa.gov/About%20Us/Pages/DOC-Policies.aspx (last visited July 26, 2021)), and we cannot find the above language in the current versions of those policies.

Two independent legal theories exist upon which a plaintiff may predicate an equal protection claim: the traditional theory and the class-of-one theory.

Bailey has made clear that he is proceeding under the class-of-one theory. Under that theory, a plaintiff may advance an equal protection claim absent membership in a protected class if the plaintiff shows that the defendants engaged in irrational and intentional differential treatment of him when compared with similarly situated individuals. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000). This theory allows a plaintiff to assert an equal protection claim regardless of protected class when the government irrationally treats the plaintiff differently from similarly situated individuals. *Id.* at 564; *Hill v. Borough of Kutztown,* 455 F.3d 225, 239 (3d Cir. 2006). To prevail on a class-of-one claim, the plaintiff must demonstrate that: (1) the defendants treated him differently from others similarly situated; (2) the defendants did so intentionally; and, (3) there was no rational basis for the difference in treatment. *Hill,* 455 F.3d at 239.

"Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992)). But "'similarly situated' does not mean 'identically situated.'" *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020) (quoting *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 178 (3d Cir. 1991), *abrogated on other grounds by St. Mary's Honor Ctr. v.*

28

*Hicks*, 509 U.S. 502, 515–16 (1993)).  "[C]ourts conducting the 'similarly situated'

inquiry 'should not demand exact correlation, but should instead seek relevant

similarity.'" *Id*. (quoting *Stimmel v. Sessions*, 879 F.3d 198, 212 (6th Cir. 2018)

(citation omitted)).  Determination of whether individuals are similarly situated is a

"'case-by-case fact-intensive inquiry.'" *McLaughlin v. Forty Fort Borough*, 64 F.

Supp. 3d 631, 648 (M.D. Pa. 2014) (quoting *Suber v. Guinta*, 902 F. Supp. 2d 591,

607 (E.D. Pa. 2012)).

In his second amended complaint, Bailey alleges that "other similarly

situated" inmates such as Robert King, Anthony C. King, and James Frankco were

exonerated after receiving permission to retest or have a second test after a positive

Nark II test. *Doc. 49* ¶¶ 22, 23, 31, 33.  But Bailey has not proffered evidence to

support that allegation.  He does, however, attach to his reply brief the same three

declarations from three other inmates (Rakeem Spencer, Keith Lee, and Tysign

Jackson) that he attached to his second amended complaint as Exhibit I. *See doc.

49-1* at 17–20; *doc. 46-1* at 3–5.  As noted above, the factual assertions in each of

these declarations are the same.  Inmates Spencer, Lee, and Jackson assert that they

are incarcerated at SCI Huntingdon; that during May 2021, they were ordered to

provide a urine sample; that they were informed that their urine samples tested

positive for marijuana and/or suboxin; that SCI Huntingdon provided a second test;

and that prison staff informed them that they would be transferred, along with

other inmates, from the prison's outside dormitories, known as the MOD's, to general population until the urine-test results were returned. *Id.*

It is questionable whether Bailey is similarly situated to these three inmates. Whereas these three inmates were drug tested in 2021, Bailey's test was conducted in 2018.  Further, whereas these three inmates' urine was tested, it was a card of Bailey's that was tested.  Moreover, there is no assertion that the Nark II test was used as to these three inmates, but that is the test that was used as to Bailey and which Bailey claims was so inaccurate that the results should not be used without a second test.

Even assuming that Bailey is similarly situated to inmates Rakeem Spencer, Keith Lee, and Tysign Jackson, and further assuming that Bailey could show that the misconduct relating to the Valentine's Day card should be expunged, he has nevertheless not shown that the misconduct relating the Valentine's Day card is what is preventing him from having visits with his mother.  Although Bailey alleges that the misconduct sanction relating to the Valentine's Day card resulted in him losing his visitation rights with his "Elderly Sick Mother," *doc. 49* ¶ 21, he has not proffered evidence to support that allegation.  The Disciplinary Hearing Report, which is attached to Bailey's second amended complaint as Exhibit C, *See doc. 49-1* at 5–6, shows that defendant Ellenberger sentenced Bailey to 45 days in

disciplinary custody, but that report does not mention anything about loss of visitation. *Id*. at 6.

Moreover, as set forth above, DC-ADM 812 provides for an indefinite ban on contact visits (subject to possible reinstatement after three years) after a prisoner's third drug-related misconduct. Here, however, the record does not reflect how many drug-related misconducts Bailey received. Thus, we cannot say that the misconduct relating to the Valentine's Day card, which is the misconduct at issue in this case, is what is keeping Bailey from having visits with his mother.

In sum, Bailey has not proffered evidence from which it can reasonably be inferred that he has a reasonable likelihood of success on the merits. Thus, he is not entitled to a preliminary injunction.

## IV.  Conclusion.

Based on the foregoing, Bailey's motion (*doc. 36*) for a preliminary injunction will be denied. An appropriate order will issue.


*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge